## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:20-CR-00058 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| JAHAZ LANGSTON | ) | AUGUST 2, 2023 |
| | ) | |
| | ) | |

### MEMORANDUM OF DECISION
### RE: MOTIONS TO SUPPRESS (ECF NOS. 580, 581 & 582)

Kari A. Dooley, United States District Judge

After two drive-by shootings in January and March of 2021, Detectives of the Bridgeport Police Department obtained a warrant on March 12, 2021 to search the person of Defendant Jahaz Langston for cell phones and their contents. The Detectives executed the warrant to search Langston's person on March 19, 2021 and seized one "newer model iPhone with a pink color protective case." That same day, the Detectives applied for and obtained another warrant to search the contents of the cell phone. Meanwhile, a parallel federal investigation into gang violence in Bridgeport, Connecticut by the Federal Bureau of Investigation ("FBI") led to the identification of Defendant Langston as a suspect in violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* During the execution of a federal arrest warrant for Langston on July 20, 2021, members of the Bridgeport Emergency Services Unit ("ESU") seized a "black iPhone in a blue Otter Box case," from the nightstand in the room where Langston was sleeping. The FBI sought and obtained a warrant to search the contents of that phone on July 27, 2021.

Langston now seeks to suppress both cell phones and their contents seized and searched pursuant to the March 12, March 19, and July 27, 2021 warrants, arguing that the warrants did not

comport with the requirements of the Fourth Amendment. Specifically, Langston argues that the warrants were unsupported by probable cause, insufficiently particularized, and unconstitutionally overbroad. The Government opposes Langston's motions, arguing that the warrants were not constitutionally defective and that, even if they were, the good faith exception to the exclusionary rule precludes suppression. For the reasons that follow, Langston's motions to suppress, ECF Nos. 580–82, are DENIED.

**FACTUAL BACKGROUND**

The Court assumes the parties' familiarity with the underlying facts and recites only those necessary to resolve the pending motions to suppress. The following facts, undisputed for purposes of these motions, are summarized from the parties' memoranda and the warrant application packages at issue here.

*March 12, 2021 State Warrant*

On March 12, 2021, Bridgeport Police Department Detectives Keith Hanson and Robert Winkler (the "affiants") applied to the Connecticut Superior Court for a warrant to search the person of Defendant Jahaz Langston. *See* Gov. Ex. 11 ("March 12th Warrant Appl.") at 1, ECF No. 600-11.[1] The warrant application, including its supporting affidavit, was prepared on the State of Connecticut's standard warrant application Form JD-CR-61. *See id.*

The first page of the application sought permission to search "The person of Jahaz Langston" and seize "All cell phones and cell phone(s) data contained therein including but not limited to call logs of calls placed and received, SMS and MMS text messages, social media messages, stored contacts, geolocation information, photographs, videos, emails and graphic files"

---

[1] The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

for "[s]ubmission to a digital forensic laboratory for a complete extraction/examination." *Id.* The affiants affirmed that they had probable cause to believe that evidence of the offense of "Assault 1st degree with a Firearm" would be found in the areas to be searched. *Id.*

The next five pages of the application package contained an affidavit prepared and attested to by the affiants. *Id.* at 2–6. The first two paragraphs of the affidavit briefly summarized the affiants' experience as members of the Bridgeport Police Department. *Id.* at 2. In the third and fourth paragraphs, the affiants described their investigations into an ongoing gang conflict between two Bridgeport gangs: the P.T. Barnum Gang of the P.T. Barnum Housing Complex, and its rival gang "Only North End," or "O.N.E." *Id.* at 2–3. The affiants averred that Langston is known to investigators as a gang member affiliated with O.N.E. *Id.* In the following paragraphs, the affidavit described two different shootings arising out of this gang conflict in which Langston was alleged to be a suspect.

The first shooting occurred on January 1, 2021, at approximately 2:52 p.m. on Fairfield Avenue in Bridgeport, Connecticut—the territory of the P.T. Barnum gang. *Id.* at 3. This shooting was a "drive-by" shooting in which a victim was struck by gunfire fired by the passenger of a passing vehicle. *Id.* This shooting was captured on surveillance footage, which allowed Bridgeport Detectives to identify the suspect vehicle as a gray 2017 Honda Civic with a license tag registered to a woman named Lezlee Y. Rose. *Id.*

Based on this information, Bridgeport Detective Azevedo-Rasuk was able to identify and locate the suspect vehicle, and thereafter sought and was granted a search and seizure warrant for the vehicle. *Id.* During the search, executed by the Bridgeport Police Identification Unit, the Identification Unit took several pictures of the display screen within the vehicle, which displayed the words "Jahaz's iphone." *Id.* The affiants attested that, "[t]hrough training and experience your

affiants know that this means that an individual who identifies their mobile cellular phone as 'Jahaz's iphone' had synced their device into that vehicle." *Id.* Detectives thereafter "developed a suspect, known as Jahaz Langston." *Id.*

The second shooting, another drive-by, occurred on the evening of March 7, 2021 in the area of the P.T. Barnum Housing Complex. *Id.* at 4. During this shooting, a victim was struck by gunfire while driving her vehicle. *Id.* The victim advised investigators that the suspect vehicle "was possibly a dark colored SUV bearing an out of state registration." *Id.* City surveillance cameras in and around the area of the shooting allowed investigators to identify a possible suspect vehicle: "a gray colored Jeep with heavy tinted windows, and no front registration plate," which could be seen following and "stalking" the victim's vehicle around the vicinity of the P.T. Barnum Housing Complex. *Id.*

A few hours after the shooting, patrol officers near the Greene Homes Housing Complex observed a vehicle with a Mississippi rear registration plate that matched the description of the suspect vehicle seen on video. *Id.* The officers stopped the vehicle, which was driven by a woman named Toni Alves and occupied by two other individuals: Defendant Langston and Co-Defendant Amire Newsome. *Id.* The vehicle was a rental car, and none of the occupants were listed on the rental agreement. *Id.* During the police encounter, Ms. Alves stated that Newsome and Langston picked her and another female up in the area of the North End of Bridgeport and instructed her to drive the vehicle. *Id.* Affiants alleged that Ms. Alves was "extremely nervous," leading her to lie about her identity and resulting in her arrest. *Id.* During an inventory search of the vehicle the officers located a laser sight for a firearm located in the vehicle's glove box. *Id.*

The affiants further averred that they had documented several posts on social media between Langston and other O.N.E. members "openly talking about shooting people and recording

4

videos of themselves brandishing firearms in an effort to intimidate other 'crews' they are disputing with." *Id.* at 5. Langston had also allegedly posted on social media about being a "PT KILLER[]" and utilized his Facebook profile to mock people who live in the P.T. Barnum Housing Complex. *Id.*

Based on their experience investigating members of O.N.E, the affiants averred that:

> Affiants believe that Jahaz Langston and his "associates" have been utilizing their cellular phones to coordinate and talk about these shootings through messages, photos and phone based social media applications. Affiants know from their training and experience that gang/group members often document themselves in the acts of these violent crimes via videos or photographs. Also, suspects will communicate with each other and talk about the shooting prior to, and after the crime, via cellular phone.
>
> Your affiants know through training and experience that a modern cellular telephone stores data relating to the telephone's usage. This data includes call logs, calls placed, calls received, stored telephone numbers, text messaging, photographs, email messages, video files, image files, and audio files. Your affiants further know that this data, even if deleted, may sometimes be retrieved through a forensic examination conducted by qualified personnel. Your affiants further know that the data, as defined by C.G.S 53a-250(8), contained within cellular telephones is useful in identifying the actual owner of the device by examining the calls or messaging sent, received, or missed. Further, the data contained within the cellular phone is useful to investigators in that it may show communication between a victim, another suspect or conspirator(s), or potential witnesses prior to, during, or after the time of the crime. Your affiants know through training and experience that cellular records are stored in the form of data on a cellular telephone and their related media. This data remains resident on the cellular telephone even if it has been turned off, not used for a long period of time, or deleted. Global Positioning Satellite (GPS) data can also be stored on a cellular device, allowing investigators to historically "track" the movements of the device.

*Id.* at 5–6. Based on the above information, the affiants attested that they:

> have reason to believe that a complete and competent extraction of all data within the cellular phone(s) in the possession of Jahaz Langston [date of birth omitted] is needed to further gather evidence

> directly related to the shooting investigations affiants have documented in this search and seizure warrant.

*Id.* at 6.

The eighth page of the warrant application package was a signed form entitled "Affidavit Requesting Dispensation With Requirement of Delivery pursuant to § 54-33c, Connecticut General Statutes." *Id.* at 8. On that page, the affiants requested that Conn. Gen. Stat. § 54-33c's requirement that a copy of the warrant application and affidavit in support of the warrant be given to the subject of the warrant at the time of its execution be dispensed with on the grounds that "[t]he search is part of a continuing investigation which would be adversely affected by the giving of a copy of the affidavits at such time." *Id.*

The same day the application was submitted, a Connecticut Superior Court Judge authorized the search warrant, which appears on the ninth page of the warrant application package. *Id.* at 9. The warrant authorized the search of "The person of Jahaz Langston" for:

> All cell phones and cell phone(s) data contained therein including but not limited to call logs of calls placed and received, SMS and MMS text messages, social media messages, stored contacts, geolocation information, photographs, videos, emails, and graphic files. Submission to a digital forensic laboratory for a complete extraction /examination and/or other detective or agency capable of completing such examination. Authorization is requested to make readable copies or recordings of the cellular telephone's data contained within this device in order to preserve and protect the information.

*Id.* The warrant also granted the affiants' request to dispense with Conn. Gen. Stat. § 54-33c's delivery requirements and permitted the nondelivery of the application for a period not to exceed 14 days. *Id.* Significantly, nowhere on the face of the warrant itself was the crime or crimes for which evidence was being sought identified. *See id.*

*March 19, 2021 State Warrant*

On March 19, 2021, affiants Hanson and Winkler executed the March 12th warrant to search Langston's person. *See* Gov.'s Ex. 12 ("March 19th Warrant Appl.") at 5, ECF No. 600-12. During the search, they found an iPhone in Langston's right sweatshirt pocket that was "confirmed to belong to Jahaz Langston" and was described as a "newer model iPhone with a pink color protective case." *Id.* That same day, the affiants prepared a second search warrant package on the State of Connecticut's standard warrant application Form JD-CR-61. *See id.* at 1. This warrant application requested permission to search "One iPhone seized from Jahaz Langston [date of birth omitted] on 3/19/21. The iPhone is currently in police custody and is described as a newer iPhone with a pink color protective case." *Id.* The application further stated that the requested contents of the iPhone "constitutes evidence" of "Assault 1st degree with a Firearm." *Id.* The affidavit in support of the warrant application is nearly identical to that submitted in support of the March 12th warrant, except that it included the additional information regarding the search of Langston and seizure of the iPhone. *See id.* at 2–6.

The search warrant, signed by the Connecticut Superior Court judge on March 19, 2021, contained the same descriptive language of the iPhone as that listed on the warrant application and authorized the search of that iPhone for all of the same data listed on the March 12th warrant. *See id.* at 9. The March 19th warrant also did not identify the crime or crimes for which evidence was being sought. *See id.*

The Government avers that, consistent with the March 19th warrant, the iPhone's content was extracted and examined for evidence of the shootings. Gov.'s Opp'n at 55–56, ECF No. 596.

*July 27, 2021 Federal Warrant*

On July 15, 2021, Langston was charged by federal indictment with participating in a RICO conspiracy with other O.N.E. members. *Id.* at 56. The Bridgeport ESU arrested him at his residence on July 20, 2021, pursuant to a federal warrant. Gov.'s Ex. 13 ("July 27th Warrant Appl.") at 29, ECF No. 600-13. On the nightstand in the room where Langston was sleeping, ESU members recovered three cell phones. *Id.* One of the phones, a "black iPhone in a blue Otter Box case," appeared to be used by Langston because its background photo was of Langston and another individual. *See id.* The other two phones were believed to belong to a woman present in Langston's room. *See id.*

On July 27, 2021, Special Agent Andrew Pappas of the FBI applied to a magistrate judge in the District of Connecticut for a federal warrant to search the black iPhone in the blue Otter Box case that was seized from Langston's home on July 20th. *Id.* at 1–2. The warrant application was prepared on the federal warrant application form AO 106A, and provided that the search was related to violations of RICO Conspiracy, 18 U.S.C. § 1962, and Violent Crimes in Aid of Racketeering, 18 U.S.C. § 1959. *Id.* at 1. In the field of the form for identifying the person or property to be searched, Agent Pappas listed, "See Attachment A, incorporated herein by reference," and in the field for identifying the person or property to be seized listed, "See Attachment B, incorporated herein by reference." *Id.* In the field inquiring, "[t]he application is based on these facts:" it said, "See affidavit of FBI Special Agent Andrew Pappas, attached." *Id.*

Attachment A described the "Property to be Searched" as: "SUBJECT PHONE 2 . . . a black iPhone in a blue Otter Box case, which was seized pursuant to a federal arrest warrant on July 20, 2021 from the bedroom where JAHAZ LANGSTON had been sleeping." *Id.* at 2. Attachment B specified the "Particular Things to be Seized," providing for the seizure of "[a]ll

records and information contained in the SUBJECT DEVICES, to include the following . . . " *Id.*

at 3. It then provided a 10-bullet list of the records and information to be obtained from the subject

phone:

> 1. the telephone number, ESN number, serial number, and SIM card number of the telephone;
>
> 2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;
>
> 3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of Title 18, United States Code, Sections 1962 (RICO and RICO conspiracy), 1959 (violent crimes in aid of racketeering) and 2 (aiding and abetting in the same) (the "Target Offenses");
>
> 4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;
>
> 5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;
>
> 6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with UPS navigation software;
>
> 7. saved searches, locations, and route history in the memory of said telephone;
>
> 8. internet browsing history, to include, internet searches in the memory of the telephone;
>
> 9. images and videos in the memory of the telephone; and,
>
> 10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

*Id.*

The 29-page affidavit submitted by Agent Pappas in support of the warrant application first described his extensive training and experience in the FBI and his involvement in the investigation into the rivalry between Bridgeport gangs including O.N.E. *See id.* at 6–8. Based on information gleaned from the investigation, "including, but not limited to, arrests of and seizures made from gang members and associates; debriefings of arrestees, confidential informants, cooperating defendants, cooperating witnesses; examination of information derived from cellphone extractions, the analysis of forensic evidence and the review of social media," the affidavit described how the Bridgeport gangs "sell drugs in the territory they respectively control . . . and shoot at/kill rival gang members who enter their territory." *Id.* at 10.

The affidavit then described how Bridgeport gang members use cell phones and social media platforms to, *inter alia*, post pictures of themselves with narcotics, promote their gangs, threaten rival gang members, and incite and celebrate acts of violence, as well as to coordinate narcotics sales, sell and trade firearms, and plan and coordinate acts of violence. *Id.* at 10–11. The affidavit detailed similar usage of phones and social media by members of O.N.E., specifically:

> O.N.E. members frequently post photographs and videos of themselves with firearms, send messages related to firearms, brag about the firearms they have, and send threatening posts to opposition gang members. They discuss and coordinate gang activities over text and Facebook Messenger. They also regularly post rap videos on YouTube touting their enterprise and instigating and promoting violence.

*Id.* at 14. The affidavit also described some of the "numerous acts of violence perpetrated by and against O.N.E./GHB members and associates" within Connecticut. *See id.* at 12–14, 25–28.

The affidavit then went on to describe Langston's use of cell phones and social media to engage with O.N.E. *See id.* at 22–29. For example, it described how Langston was added to a O.N.E. group chat in which other members of O.N.E. discussed alleged criminal activities such as "someone who had been chased by police on Facebook Live," the use of a stolen vehicle, and

"O.N.E.'s vendetta to include killing members of the P.T. Barnum gang." *Id.* at 22–23. The affidavit also described some of Langston's Facebook posts, including photographs with other O.N.E. members and captions that showed his allegiance to the gang. *See id.* at 23–25. For example:

> LANGSTON's Facebook account advertises his association with O.N.E. His Facebook name, "Jahaz NorthEnd (RIPbuck bigonehaz)" explicitly shows the association to "Only North End"— "buck" refers to Kyree Kennedy, a dead gang member, and "bigone" is a direct reference to the gang. In May of this year, LANGSTON posted a photograph of himself, his brother Ashan (also an O.N.E. member), JOSHUA GILBERT, and AMIRE NEWSOME. LANGSTON and GILBERT were holding their hands as guns, and NEWSOME was extending his finger under his nose, a gesture indicating murder. The caption, in reference to the anniversary of "Buck's" death, read, "& since you died we been filling up the churches for you."

*Id.* at 23.

The affidavit also discussed the drive-by shooting that occurred on March 7, 2021. It included many of the same facts alleged in the March state warrant packages, but also added additional information that had since been gathered in the investigation, much of which tied Langston to the shooting. *See id.* at 25–28. For example, records from the rental car company showed that the suspect vehicle, a Jeep, had been rented by Langston's mother, a DNA profile found on the laser sight found in the vehicle's glove compartment matched Langston's DNA profile, and a cell phone previously seized from Langston had connected to the vehicle's Infotainment system the night of the shooting. *Id.* Further, Langston had posted on his Facebook account about driving a Jeep the week after the shooting, as well as texted with a fellow gang member about the vehicle. *Id.* at 27.

The affidavit also described how Toni Alves, the vehicle's driver, implicated Langston in the March 7th shooting in a conversation over a jail phone, stating that her arrest was Langston's

fault and that the car had been in a "whole shooting the day that [she] was driving it." *Id.* at 27–

28. She threatened to inform rival gang members of where Langston's mother lived if he and his

associates did not give her money. *Id.*

Agent Pappas then again attested that, based on his training an experience, he believes that

"O.N.E. members regularly use their cellphones to access social media in order to further the

racketeering conspiracy." *Id.* at 29. He further attested that:

> there is probable cause to believe that the SUBJECT DEVICES
> were used by GILBERT and LANGSTON and others to
> communicate about criminal activity related to O.N.E.
>
> Based on my training and experience, I know that the SUBJECT
> DEVICES may have some or all of the capabilities that allow each
> one to serve as a wireless telephone, digital camera and video
> recorder, portable media player, global positioning system
> navigation device, hand-held radio, and a personal digital assistant.
> In my training and experience, examining data stored on devices like
> the SUBJECT DEVICES can uncover, among other things,
> evidence that reveals or suggests who possessed or used the
> particular device, as well as evidence relating to other persons with
> whom the device's user was in contact.
>
> Furthermore, based on my training and experience, I know that
> internet browsing history stored on cellular telephones can contain
> evidence of text communications between persons who conspire to
> commit criminal activity together . . . . [and] of internet searches for
> locations and addresses. Here, such browsing history may contain
> information about the targeted locations or evidence of the
> defendants searching the news for reports of incidents after they
> occurred, something agents have also found in phones of O.N.E.
> members. There may also be evidence of searches for firearms or
> information about the vehicles used in gang activities. Further,
> based on my training and experience, I know that cellular telephones
> may contain videos and images of co-conspirators; information
> regarding possible locations involved in gang activity, information
> about firearms, among other information.

*Id.* at 29–30. Agent Pappas therefore sought permission to search the cell phone seized from

Langston's bedroom for the same records and data enumerated in Attachment B. *Id.* at 30–31.

A federal magistrate judge reviewed the affidavit and application and signed the search warrant on July 27, 2021, allowing for the search of the property listed in Attachment A and extraction and analysis of the data listed in Attachment B. *See* Gov. Ex. 14  ("July 27th Warrant") at 1, ECF No. 600-14. The Government avers that forensic examiners and case investigators conducted an extraction and analysis of Langston's iPhone and seized "data connected to RICO, RICO conspiracy, violent crimes in aid of racketeering, and aiding and abetting, the crimes under investigation and specifically referenced in the warrant, affidavit, and application." Gov.'s Opp'n at 58.

**STANDARD OF REVIEW**

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). "To prevent such general, exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.* (internal citations and quotations omitted).

**Probable Cause**

"To be lawful under the Constitution, a search warrant must, *inter alia*, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime

can be found in what is to be searched." *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Although the probable cause standard "does not demand 'hard certainties' . . . it does require more than a 'hunch.'" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 238, and *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968)). Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (cleaned up). This decision "must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians, act.'" *Lauria*, 70 F.4th at 128 (quoting *Gates*, 462 U.S. at 231, 238, 241).

A court reviewing an issuing judge's finding of probable cause "must accord considerable deference to the probable cause determination." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007); *see also Gates*, 462 U.S. at 236 ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." (internal quotations omitted)). The reviewing court's task "is simply to ensure that the totality of the circumstances afforded the [issuing judge] 'a substantial basis' for making the requisite probable cause determination." *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (quoting *Gates*, 462 U.S. at 238). Additionally, the issuing judge's "finding of probable cause is itself a substantial factor tending to uphold the validity of [a] warrant." *United States v. Travisano*, 724 F.2d 341, 345

(2d Cir. 1983). In the end, any doubts that remain "should be resolved in favor of upholding the warrant." *Id.*

**Particularity & Overbreadth**

The Warrants Clause both "requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "The manifest purpose of this particularity requirement was to prevent general searches." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). By ensuring that a warrant is sufficiently specific, the particularity requirement ensures that a warrant "does not 'leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.'" *United States v. Conley*, 342 F. Supp. 3d 247, 270 (D. Conn. 2018) (quoting *United States v. Wey*, 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017)).

Thus, "[t]o be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Finally, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal citations and quotations omitted). "A warrant is facially unconstitutional if it fails to comply with any of these requirements." *Purcell*, 967 F.3d at 178. Specificity in a warrant's application or other supporting documents generally cannot cure the constitutional defects of an unparticularized warrant because "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Id.* at 179 (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). "However, 'a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of

incorporation, and if the supporting document accompanies the warrant.'" *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 99–100 (2d Cir. 2016) (quoting *Groh*, 540 U.S. at 557–58).

"[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. However, a warrant that comports with the Fourth Amendment's particularity requirements may nevertheless be overbroad where the "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotations omitted). Although frequently conflated, "breadth and particularity are related but distinct concepts," *Ulbricht*, 858 F.3d at 102, and "[t]he doctrine of overbreadth represents . . . an intersection point for probable cause and particularity," *Conley*, 342 F. Supp. 3d at 271 (quoting *Wey*, 256 F. Supp. 3d at 382). Thus, "an unparticularized description of the items subject to search under a warrant may result in the warrant exceeding the scope of established probable cause." *Conley*, 342 F. Supp. 3d at 271. "In other words, a warrant is overbroad if the description of items to be searched or seized is broader than the limits imposed by the probable cause justifying the warrant." *Id.*

**Good Faith & The Exclusionary Rule**

"The Fourth Amendment 'contains no provision expressly precluding the use of evidence obtained in violations of its commands.'" *Wey*, 256 F. Supp. 3d at 394 (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The Supreme Court has nevertheless "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," in order to "safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009). However, "[a] violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule" as "'exclusion has always been [a

16

court's] last resort, not [a] first impulse.'" *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010)
(quoting *Herring*, 555 U.S. at 140).

"Application of the exclusionary rule depends on the efficacy of the rule in deterring Fourth
Amendment violations in the future as well as a determination that the benefits of deterrence
outweigh the costs." *Id.* at 64 (cleaned up). Moreover, "[t]he extent to which the exclusionary rule
is justified by these deterrence principles varies with the culpability of the law enforcement
conduct." *Id.* (quoting *Herring*, 555 U.S. at 143). Thus, the exclusionary rule's deterrence value
"justifies its cost when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth
Amendment rights." *United States v. Raymonda*, 780 F.3d 105, 117–18 (2d Cir. 2015) (quotations
omitted). Conversely, "when police act with an objectively reasonable good-faith belief that their
conduct is lawful, or when their conduct involves only simple, isolated negligence," exclusion is
not warranted because there is "nothing to deter." *Id.* (quotations omitted).

Accordingly, "the good-faith exception to the exclusionary rule applies when an officer
'genuinely believes that he has obtained a valid warrant from a magistrate judge and executes that
warrant in good faith,' as long as the officer's reliance on the warrant is 'objectively reasonable.'"
*Conley*, 342 F. Supp. 3d at 273 (quoting *Raymonda*, 780 F.3d at 118). "The government bears the
burden of 'demonstrat[ing] the objective reasonableness of the officers' good faith reliance' on an
invalidated warrant.'" *United States v. Sandalo*, No. 21-708-CR, 2023 WL 3885805, at *2 (2d Cir.
June 8, 2023) (summary order) (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).
And while an officer's reliance on a warrant is entitled to a "presumption of reasonableness," *id.*
(quotation omitted), the Supreme Court has identified four circumstances in which the good-faith
exception will not apply:

> (1) where the issuing magistrate has been knowingly misled; (2)
> where the issuing magistrate wholly abandoned his or her judicial

> role; (3) where the application is so lacking in indicia of probable
> cause as to render reliance upon it unreasonable; and (4) where the
> warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

**DISCUSSION**

Langston seeks to suppress the cell phones and their contents seized and searched pursuant to the March 12, March 19, and July 27, 2021 warrants, arguing that each of the warrants violated the Fourth Amendment. *See* Mots. to Suppress, ECF Nos. 580–82. Specifically, Langston argues that the warrants were unsupported by probable cause, insufficiently particularized, and unconstitutionally overbroad.[2] In response, the Government argues that the warrants complied with all of the requirements of the Fourth Amendment, and that, even if they did not, the good faith exception to the exclusionary rule applies and therefore suppression is not warranted. *See* Gov.'s Opp'n at 59–60 & n.18. The Court agrees with the Government.

**Probable Cause**

Langston advances two primary arguments regarding the probable cause to support each warrant. First, that the warrants' supporting affidavits failed to provide probable cause to believe that any of the cell phones to be searched were sufficiently connected to the crimes under investigation. *See* Mar. 12 Mot. at 12–14; Mar. 19 Mot. at 13–15; July 27 Mot. at 14–15. And second, that even if the warrants might have been supported by probable cause at a prior date and time, any such probable cause had become stale and so could not support the issuance of the warrants in March and July for events that occurred in January and March of the same year. *See*

---

[2] *See* Mot. to Suppress Mar. 12, 2021 Search Warrant ("Mar. 12 Mot.") at 7, ECF No. 580; Mot. to Suppress Mar. 19, 2021 Search Warrant ("Mar. 19 Mot.") at 8, ECF No. 581; Mot. to Suppress July 27, 2021 Search Warrant ("July 27 Mot.") at 7, ECF No. 582.

Mar. 12 Mot. at 14–15; Mar. 19 Mot. at 15–16; July 27 Mot. at 12–14. Neither argument is persuasive.

*Staleness*

"[A] warrant lacks probable cause where the evidence supporting it is not sufficiently close in time to the issuance of the warrant that probable cause can be said to exist *as of the time of the search*—that is, where the facts supporting criminal activity have grown stale by the time that the warrant issues." *Raymonda*, 780 F.3d at 114 (emphasis in original) (internal quotation marks omitted). Courts do not draw a "bright-line rule for staleness." *Walczyk*, 496 F.3d at 162. Rather, "[t]he key question is 'whether [it is] reasonable to believe that the evidence sought is still in the location where it is sought, or whether so long a period of time has passed as to make it doubtful that the evidence is still there.'" *United States v. Pizarro*, No. 17-CR-151 (AJN), 2018 WL 1737236, at *9 (S.D.N.Y. Apr. 10, 2018) (quoting *United States v. Salomon-Mendez*, 992 F. Supp. 2d 340, 347 (S.D.N.Y. 2014)), *aff'd*, No. 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023).

Langston argues that any probable cause contained in the state warrants was stale because 71 and 78 days had passed between the January shooting and the issuance of the March 12th and 19th warrants, respectively. *See* Mar. 12 Mot. at 13–15; Mar. 19 Mot. at 14–16. Due to this passage of time, Langston argues that there was no reason to believe that evidence of the January shooting would still be contained on any cell phones in his possession. Langston's argument fails for two reasons. First, the warrants were not premised only on facts related to the January shooting; their supporting affidavits also provided a substantial factual basis to believe that evidence of the March shooting would be located on a phone in Langston's possession. Second, Langston's argument ignores common sense and the practical reality of modern life; most people maintain possession

19

of their cell phones for extended periods of time—certainly longer than the two to three months at issue here. Further, cell phones can store information for months or even years. *See Riley v. California*, 573 U.S. 373, 394 (2014) (observing that "data on a phone can date back to the purchase of the phone, or even earlier"). Indeed, the affiants highlighted the evidentiary value of the data contained on the cell phones *because* of their unique ability to store and hold data for extended periods of time. *Cf. id.* at 393–97 (detailing the ways in which "[c]ell phones differ in both a quantitative and a qualitative sense" from other objects that might be found on a person subject to a search because of their immense storage capacity). And, in the modern world of "cloud" technology, many cell phones, even when replaced, will nevertheless contain or have the capacity to access information that was stored on previous devices. *See United States v. Gerace*, No. 119CR227JLSMJR, 2022 WL 17478270, at *6 (W.D.N.Y. Aug. 5, 2022) (rejecting the defendant's argument that probable cause was stale because the warrant's supporting affidavit failed to show that the seized phone was the same one used during the crimes alleged, reasoning that "commonsense principles of data transfer and retention for modern cell phones . . . suggest that relevant evidence would still have been stored on the phone in [the defendant's] possession at the time of his arrest"), *report and recommendation adopted sub nom.*, *United States v. Bongiovanni*, No. 19CR227JLSMJR, 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022). Thus, the issuing judge could properly find that there remained a fair probability that evidence of both shootings would be located on Langston's phones at the time the March warrants were issued.

Langston likewise contends that the probable cause to support the July 27, 2021 federal warrant was stale because "there were no facts that would lead to a reasonable belief that the cellphone associated with incidents dating back to October 4, 2020, would be located on the [phone] seized on July 20, 2021, two-hundred and ninety days later." July 27 Mot. at 13. This

argument fails for similar reasons that the argument failed with respect to the state warrants. Further, the federal warrant was premised upon Langston's suspected involvement in a RICO conspiracy, which was alleged to have been ongoing for an extended period of time. Thus, although the predicate facts set out in the warrant's supporting affidavit may have *began* 290 days before the warrant was issued, this does not diminish the probable cause to believe that evidence of the ongoing RICO conspiracy would be found on Langston's phone in July 2021. *See United States v. King*, No. 3:17CR149 (JBA), 2018 WL 4005734, at *5 (D. Conn. Aug. 22, 2018) ("[W]here there is a 'pattern of continuing criminal activity' which gives 'reason to believe that the cited activity was probably not a one-time occurrence,' then 'facts of past criminal activity' which might otherwise be 'too stale' can still be sufficient to support a finding of probable cause." (quoting *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993)); *United States v. Mouzon*, No. 16 CR 284 (CM), 2016 WL 7188150, at *6 (S.D.N.Y. Dec. 2, 2016) (collecting cases).

*Probable Cause—State Warrants*

The Court next turns to Langston's argument that the March 12th and March 19th state warrants, which were supported by near-identical affidavits—were unsupported by probable cause at all. Specifically, Langston asserts that the affidavits did not establish probable cause because the affiants failed to allege any facts tying any cell phones to the shootings in question. *See* Mar. 12 Mot. at 13–15; Mar. 19 Mot. at 14–16. Langston identifies examples of what types of facts he believes would have been sufficient to establish probable cause, such as if "any witness observe[d] Langston talking on a cell phone prior to the observing the March 7, 2021 criminal activity" or if "a reliable informant call[ed] the cell phone proving the phone was used by Langston for criminal activity on March 7, 2021." Mar. 12 Mot. at 15; Mar. 19 Mot. at 16. Noting that the affiants set forth no such facts, Langston concludes that there was no probable cause because "the affiants

failed to allege that the defendant, Langston, used any particular cellphone . . . associated with the March 7, 2021 'drive-by' shooting incident." Mar. 12 Mot. at 15; Mar. 19 Mot. at 16.

Langston misunderstands the relevant inquiry. In determining whether probable cause existed to search Langston's person for cell phones and their contents, the relevant inquiry is not whether the affiants put forth evidence that Langston "used any particular cellphone" in association with the subject offenses, but rather whether the facts alleged in the affidavits, taken as a whole, afforded the issuing judge with a substantial basis to conclude that there was a fair probability that "evidence of a crime will be found" on Langston's phones. *See Boles*, 914 F.3d at 102. And, when "all the circumstances set forth in the affidavit[s]" here are viewed in their entirety, the issuing judge could certainly have made the "practical, common-sense decision" that "there [was] a fair probability that contraband or evidence" of the shootings could be found on the cell phones subject to the state warrants. *Id.* (internal quotation marks omitted).

First, the state warrants' supporting affidavits provided a factual basis to establish that Langston was involved in the January and March 2021 drive-by shootings. *See Lauria*, 70 F.4th at 130 n.14 ("[P]robable cause as to a person's criminal conduct can sometimes inform probable cause to search a place used or frequented by that person or to obtain records for electronic devices linked to that person."). The affidavits provided that, through information gleaned from an investigation conducted in conjunction with federal agencies, the affiants knew that O.N.E. was engaged in a violent conflict with the P.T. Barnum gang, and that the shootings in question occurred in the territory of the P.T. Barnum gang. The affidavits also provided that Langston was known to investigators as a gang members associated with O.N.E., and that Langston and other members of O.N.E. had utilized social media to openly discuss killing people who live at or are associated with the P.T. Barnum Housing Complex. From this, the issuing judge could properly

conclude that the shooting was likely perpetrated by members of O.N.E. and that Langston may have been involved in one or both of such shootings.

With regard to the January shooting, specifically, the affidavits explained that the display screen of the suspect vehicle displayed the words "Jahaz's iPhone," which was an indication that someone who identifies their cellular phone as "Jahaz's iPhone" had synced their device to the suspect vehicle. Similarly, with regard to the March shooting, the affidavits provided that only hours after the shooting in question, Langston was found inside of a vehicle matching the description of the suspect vehicle, and a firearm laser sight was found in the glove compartment of the vehicle.

Further, the affidavits provided a factual basis to believe that evidence of such shootings would be on phones on Langston's person, specifically. As noted above, the affiants documented several instances in which Langston and his associates posted on social media about killing people from the P.T. Barnum gang—calling themselves "PT KILLERS"—and posted videos of themselves brandishing firearms. "Jahaz's iPhone" was connected to the suspect vehicle, indicating that at least one cell phone, presumably owned by an individual named "Jahaz," was directly linked to the January shooting.[3] The affiants bolstered these conclusions with their training and experience, attesting that they believe that Langston and other members of O.N.E. utilized their cell phones to coordinate and discuss shootings via text messages, photos, and social media,

---

[3] To the extent that Langston challenges the probable cause to support the affidavits because they sought to search all phones found on Langston's person, rather than "Jahaz's iPhone," specifically, this argument is unpersuasive. *See* Mar. 12 Mot. at 10–12; Mar. 19 Mot. at 11–13. Common sense dictates that cell phones do not generally indicate on their face the identity of their owner, but that a phone found on the person of an individual will, more often than not, belong to that individual. Moreover, although the fact that "Jahaz's iPhone" was connected to the suspect vehicle supports the conclusion that there was probable cause to search cell phones on Langston's person, that does not mean there was *only* probable cause to support a search of that phone. Rather, the affidavits put forth evidence that Langston used an unspecified device or devices to post about his criminal activities on social media, and the affiants' attestations based on training and experience provide a substantial basis for the issuing judge to conclude that there was a fair probability that any devices used by Langston may contain evidence of the crimes.

and that gang members often document themselves in the act of violent crimes through photo or video. They further attested that they knew through training and experience that cell phones contain data including call logs, text messages, photographs, video files, image files, and GPS data. *See United States v. Benevento*, 836 F.2d 60, 71 (2d Cir. 1987) ("[A] government agent's expert opinion . . . is an important factor to be considered by the judge when making a probable cause determination." (internal quotations omitted)), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989). In short, this is not a close call. The state warrants provided ample information to support the issuing judge's determinations of probable cause.

*Federal Warrant*

The same is true of the federal warrant issued on July 27, 2021. The federal warrant application included many of the facts set forth in the March warrant affidavits, and further provided more evidence suggesting that Langston was involved in a RICO conspiracy—O.N.E.— and had committed violent acts in furtherance of that conspiracy. As to Langston's involvement in the conspiracy, the affidavit discussed several instances in which Langston expressed his affiliation with and allegiance to O.N.E. on social media. It also detailed Langston's association with other known members of O.N.E. and discussed how he was added to a group chat with O.N.E. members immediately upon his release from prison.

Further, the affidavit provided details regarding the March shooting that made it more probable that Langston was involved with the shooting and that it was an act of violence in furtherance of O.N.E. The affidavit revealed that the vehicle suspected to have been used to perpetrate the shooting was registered to Langston's mother. It also revealed that gun powder residue was found in the vehicle, that Langston's DNA had been found on the laser sight in the vehicle's glove compartment, and that a phone that had been seized from Langston had previously

24

been connected to the vehicle's Infotainment center. Finally, it established that data from Langston's seized cell phone showed photographs of firearms and talk between Langston and another suspected O.N.E. member about the suspect vehicle. This evidence, along with ample other evidence set forth in the affidavit, certainly could support a fair probability that Langston was involved in a RICO conspiracy and had committed acts of violence in furtherance of that conspiracy.

Further, the affidavit provided a sufficient factual basis to believe that evidence of this conspiracy would be found on the phone seized from the room in which Langston had been sleeping. The affidavit provided, in substantial detail, how both Bridgeport gangs in general and O.N.E. specifically used cell phones and social media to further the objectives of the gangs. The affidavit also detailed multiple specific instances in which Langston had posted on social media about his gang activities and instances in which he communicated with other members of O.N.E. about the gang's activities. For example, the affidavit provided that Langston was in a group chat with other O.N.E. members in which they discussed criminal activities such as the theft of a truck, O.N.E.'s "vendetta to include killing members of the P.T. Barnum gang," and an event in which someone was chased by police on Facebook live. The affiant also relied upon his training and experience to conclude that similar evidence of Langston and O.N.E.'s racketeering activities and acts of violence would likely be found on Langston's phone. And as the Supreme Court has observed, "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 401.

Thus, the issuing judge could certainly conclude that there was a fair probability that evidence of the crimes in question would be found on Langston's phone. Accordingly, the Court defers to the issuing judges' finding of probable cause to support the warrants.

**Particularity**

Langston next challenges all three warrants on the grounds that they are insufficiently particularized and unconstitutionally overbroad. *See* Mar. 12 Mot. at 8–12; Mar. 19 Mot. at 9–13; July 27 Mot. at 8–12.

At the outset, the Court notes that nowhere on the face of the state warrants was the crime for which probable cause was established, Assault in the 1st Degree, identified.[4] The Second Circuit has routinely stated that to be sufficiently particularized, a warrant "must identify the alleged crime for which evidence is sought." *In re 650 Fifth Ave.*, 830 F.3d at 99. Therefore, the warrants are constitutionally defective for failure to comply with the first prong of the Fourth Amendment's particularity requirement unless the Court can properly consider the warrants' supporting materials to remedy the defect.

With regard to the state warrants, the Court cannot turn to the warrants' supporting applications and affidavits to cure this deficiency. "[T]he Fourth Amendment 'requires particularity in the warrant, not in the supporting documents,'" *Wey*, 256 F. Supp. 3d at 381 (quoting *Groh*, 540 U.S. at 557), and a court may only construe a warrant with reference to its supporting materials "if the warrant uses appropriate words of incorporation, *and* if the supporting document accompanies the warrant." *In re 650 Fifth Ave.*, 830 F.3d at 99–100 (emphasis added)

---

[4] Langston does not appear to have raised any argument premised on this failure. Other Defendants have, though, and the Government has had an adequate opportunity to respond to those arguments, so the Court addresses this deficiency here. *See* Gilbert's Mem. in Supp. of Mot. to Suppress at 25–29, ECF No. 469; Gov.'s Opp'n at 23–26.

(quoting *Groh*, 540 U.S. at 557–58); *see United States v. Sandalo*, No. 21-708-CR, 2023 WL 3885805, at *2–3 (2d Cir. June 8, 2023) (summary order) (explaining that a warrant that incorporated its supporting materials "remain[ed] constitutionally defective" where the "documents were not 'attached' in the legally relevant sense; they were not included with the search warrant when it was presented to [the defendant]"). Here, the state warrant forms successfully incorporated the supporting affidavit and application, however the documents were not attached to the warrant at the time the warrant was executed. Rather, the documents were withheld for a period of 14 days pursuant to Conn. Gen. Stat. § 54-33c. Accordingly, the Court may not resort to the state warrants' supporting materials to cure this facial defect in the search warrants. The state warrants therefore are facially deficient for failure to comply with the first prong of the Fourth Amendment's particularity requirement.[5]

Langston appears to advance two arguments regarding the warrants' particularity and overbreadth. First, that the cell phones subject to search were not sufficiently described in the warrants. *See* Mar. 12 Mot. at 9–10; Mar. 19 Mot. at 9–11; July 27 Mot. at 8–11. Second, that the warrants were overbroad because the "temporal connection between any cellphone allegedly used by the defendant, Langston" on January 1, 2021 or March 7, 2021, and any cell phone possessed by Langston on March 12, March 19, or July 27, 2021, was "insufficient." *See* Mar. 12 Mot. at 12; Mar. 19 Mot. at 12; July 27 Mot. at 12. Langston further asserts that the federal warrant, which identified conduct going back to October of 2020, was even more temporally attenuated. *See* July

---

[5] Although not raised, the Court notes that the same is not true of the federal warrant. Although the crimes for which probable cause was established were not included on the face of the warrant, the warrant expressly incorporates by reference Attachment B, which accompanied the warrant and which listed under "Things to be Seized" "descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of Title 18, United States Code, Sections 1962 (RICO and RICO conspiracy), 1959 (violent crimes in aid of racketeering) and 2 (aiding and abetting in the same) (the "Target Offenses")." Thus, the warrant itself fairly apprised Langston of the crimes under investigation for which probable cause to search had been established.

27 Mot. at 12, 14–15. As to the first issue, the description of the phones subject to seizure was adequate to allow the searching agents to know what could be seized as within the scope of the warrant. *See Conley*, 342 F. Supp. 3d at 270. As to both the March 19th and the July 27th warrants, the phones had already been seized and were in law enforcement's custody. It is difficult to imagine how law enforcement would be confused as to which phones were subject to search. As to the March 12th warrant, it authorized "all cell phones" on the person of Jahaz Langston. Again, there is nothing vague as to the particulars of what could be seized under the terms of the warrant.[6]

As to the overbreadth argument, Langston appears to rely upon the lack of temporal connection between the phones subject to seizure and the crimes under investigation. This concern is addressed above in the discussion of whether the warrants were stale and is not further addressed by the Court.[7] *See supra* pp. 19–21.

**Good Faith**

Langston argues that, given the constitutional deficiencies of the warrants, the cell phones and their contents seized and searched pursuant to the March warrants[8] should be suppressed. Mar. 12 Mot. at 7; Mar. 19 Mot. at 7. The Court disagrees.

As discussed above, the Court has found that the state warrants were facially defective because they failed to identify the crimes for which probable cause was established in violation of the Fourth Amendment's particularity requirement. "Not every facially deficient warrant,

---

[6] Langston does not advance a particularity argument as to the March 12th warrants' authorization that the contents of any seized phones may be seized, as well. The argument is advanced as to the physical phones, themselves. The Court is not asked, and does not decide, whether there are any particularity concerns regarding the scope of the warrant as it relates to the contents of the cell phones.

[7] Within the discussion of overbreadth, Langston asserts in conclusory fashion that the warrant permitted a search beyond the scope of the probable cause established. *See* Mar. 12 Mot. at 12; Mar. 19 Mot. at 13; July 27 Mot. at 12. This is the very definition of overbreadth. However, absent any analysis as to the basis for this assertion, the Court cannot address this claim. As discussed above, the only fact-based argument as to overbreadth derives from the temporal connection between the phones and the crimes.

[8] As the Court has not identified any constitutional infirmity with respect to the federal warrant issued on July 27, 2021, no discussion of the good faith exception to the warrant requirement is included as to that warrant.

however, will be so defective that an officer will lack a reasonable basis for relying upon it." *Rosa*, 626 F.3d at 66. Rather, application of the fourth *Leon* scenario "depend[s] on the circumstances of the particular case." *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 162–63 (2d Cir. 2019) (quoting *Leon*, 468 U.S. at 923). "The animating concern is whether the 'warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.'" *Id.* (quoting *Leon*, 468 U.S. at 923).

In this context, courts have often found that the good faith exception will save a facially defective warrant where the executing officers nevertheless conducted the search pursuant to the warrant "in accordance with the appropriate limitations set forth in the unincorporated and unattached supporting application or affidavit." *Sandalo*, 2023 WL 3885805, at *1 (citing *Rosa*, 626 F.3d at 64). For example, in *Sandalo*, the court applied the good faith exception where officers executed a warrant for the search of an apartment that failed to identify the crime on its face and was insufficiently particularized and overbroad because "the officers executing the search warrant were clearly aware of and conducted the search according to the limitations set forth in the application and affidavit." *Id.* at *2. Significantly, the affidavit in *Sandalo*, which was incorporated by the warrant but not attached at the time of the warrant's execution, did not contain the same defects as the warrant itself, as it expressly excluded areas of the apartment that were outside of the scope of probable cause and limited the timeframe of the items to be seized to the relevant periods of investigation. *Id.* at *3. Further, the warrant application specified the alleged crimes for which probable cause was established, the search team executing the warrant was led by one of the affiants, and the search team seized only items related to the crimes specified in the application and did not search areas falling outside of the scope of the warrant. *Id.*; *see also Rosa*, 626 F.3d at 64–65 (finding that the good faith exception applied to a warrant that did not set forth the nature

29

of the suspected criminal activity where the affiant and officers executing the search were under substantial time pressures, the affiant was personally involved in the execution of the warrant, and the executing officers complied with the limits of the search as set forth in the warrant's supporting application).

Here, like in *Sandalo*, the affidavits and applications supporting the state warrants remedied the defect in the warrants because they specified the crime for which probable cause was established: Assault 1st Degree with a Firearm. The affiants of the March 12th warrant were the same officers who executed the warrant and searched Langston for phones, and were therefore aware of the parameters of the warrants and basis for probable cause. Langston makes no claim that the search teams went beyond the scope of the search authorized in any of the warrants;[9] indeed, once the affiants obtained a phone after executing the March 12th warrant, rather than immediately extract its contents, although they were likely authorized to do so under the authority of the March 12th warrant, they sought and secured a second warrant. This does not evince the type of grossly negligent disregard for constitutional rights that is necessary to deter, but rather the type of good-faith attempt to comply with the law even if it may have fallen short.

Moreover, while the Court "may no longer rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the Court's] determination of whether the officers acted in good faith because they contribute to [the Court's] assessment of the officers' conduct in a particular case." *Rosa*, 626 F.3d at 64. Here, the warrants and their supporting materials evidence the affiants' good-faith efforts to comply with the requirements of the Fourth Amendment.

---

[9] Langston may later challenge specific evidence obtained from the cell phones if he believes such evidence fell outside the scope of the warrants' authorization.

Although the Court does not believe that the warrants lacked particularity or were overbroad as averred by Langston, the Court observes that the affiants did set parameters on the searches in the warrants and supporting documents. Both of the state warrants articulated particular categories of data and records sought, *i.e.,* "cell phone(s) data . . . including but not limited to call logs of calls placed and received, SMS and MMS text messages, social media messages, stored contacts, geolocation information, photographs, videos, emails and graphic files."

Likewise, both of the warrant applications indicated that they were seeking evidence that was related to the specified offenses. Courts have previously held that similar restrictions are sufficient to satisfy the Fourth Amendment's particularity requirement in the digital context. *See, e.g.*, *Lustyik*, 57 F. Supp. 3d at 228 ("A list providing examples of the items to be seized, albeit a list modified by the phrase "including, but not limited to," offers sufficient guidance to law enforcement officers to pass constitutional muster."); *United States v. Adams*, No. 1:20-CR-12 LJV (MJR), 2021 WL 10265208, at *11 (W.D.N.Y. Aug. 16, 2021) (finding that a warrant was sufficiently particularized where it sought all records from a phone that were "related to narcotics trafficking" and provided an illustrative list of such records), *report and recommendation adopted*, No. 20-CR-12, 2023 WL 2142148 (W.D.N.Y. Feb. 21, 2023); *United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 WL 3448161, at *13 (D. Conn. July 17, 2018) (finding warrants sufficiently particularized where they "limited the seizures to evidence of violations of the criminal statutes at issue and provided an illustrative list of the items to be seized, a framework courts have held meets the third particularity requirement"); *United States v. Ukhuebor*, No. 20-MJ-1155 (LDH), 2021 WL 1062535, at *4 (E.D.N.Y. Mar. 19, 2021) ("[W]here, like here, items to be seized are defined by reference to particular offenses and the use of an illustrative list, courts in this Circuit have routinely upheld the warrant as sufficiently particularized." (internal quotations omitted)).

Accordingly, the Court cannot hold, absent definitive guidance from the Second Circuit as to what particular parameters are necessary to meet the Fourth Amendment's requirements in the digital realm, that the law enforcement officers were not acting in good faith when relying upon the judicially authorized warrants. The Court therefore finds that the good faith exception to the exclusionary rule applies, and the cell phones and their contents seized and searched pursuant to the March 12th and March 19th warrants should not be suppressed.

**CONCLUSION**

For the foregoing reasons, Defendant Langston's motions to suppress, ECF Nos. 580, 581 & 582, are DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of August 2023.

 _/s/ Kari A. Dooley_                    
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE